No. 24-6153

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Diego Pavia

*Plaintiff/Appellee*

v.

National Collegiate Athletic Association

*Defendant/Appellant*

On Appeal from United States District Court for the
Middle District of Tennessee
Nashville Division

## BRIEF OF APPELLEE DIEGO PAVIA

Ryan Downton
The Texas Trial Group
193 Dorado Beach East
Dorado, PR 00646
Telephone: (512) 680-7947
Email: Ryan@TheTexasTrialGroup.com

Salvador M. Hernandez
Riley & Jacobson, PLC
1906 West End Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com

*Counsel for Plaintiff/Appellant Diego Pavia*

# <u>TABLE OF CONTENTS</u>

**Page**

Table of Contents ................................................................................. i

Table of Authorities ........................................................................... iii

Statement of the Case ..........................................................................1

Summary of the Argument ...................................................................2

Argument................................................................................................5

    I.    Standard of Review...................................................................5

    II.    The District Court Utilized The Appropriate Legal Standard...............6

    III.    The District Court Made No Clearly Erroneous Findings of Fact........6

    IV.    The District Court Properly Applied the Law to Its Factual Findings ..................................................................................15

        A.    The JUCO Transfer Restrictions are Commercial in Nature..................................................................................15

        B.    Pavia Has Shown Likelihood of Success on the Merits as Demonstrated by the District Court's Rule of Reason Analysis ..................................................................................19

            1.    The District Court Did Not Commit Clear Error in Ruling the JUCO Transfer Restrictions Have a Substantial Anticompetitive Effect on Both Relevant Markets ............................................................20

            2.    The District Court Did Not Commit Clear Error in Rejecting the NCAA's Supposed Procompetitive Justifications ................................................................22

            3.    The District Court Did Not Commit Clear Error In Recognizing Less Restrictive Means Identified by Pavia.................................................................................23

i

C.    Pavia Demonstrated He Was Likely to Suffer Irreparable Harm............................................................................25

D.    The NCAA Does Not Contest the Balance of Equity or Impact on the Public Interest ...................................................26

Conclusion ..........................................................................................26

Certificate of Compliance .....................................................................27

Certificate of Service ...........................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Agnew v. NCAA*, 683 F. 3d 328, 342–43 (7th Cir. 2012) ..........................................2

*Banks v. NCAA*, 746 F. Supp. at 861 (N.D. Ind. 1990) .............................................2

*Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008)....................................2, 18, 19

*Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv238, 2024
 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024).....................................................18

*Certified Restoration Dry Cleaning Network, LLC. v. Tenke Corp.*,
 511 F.3d 535, 543 (6th Cir. 2007) ......................................................................9

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430
 (6th Cir. 2014)......................................................................................................5

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d
 1354, 1356 (6th Cir. 1985)...................................................................................9

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017)................................6

*DV Diamond Club of Flint, LLC v. Small Business Administration*,
 960 F.3d 743, 746 (6th Cir. 2020) .......................................................................5

*Gaines v. NCAA*, 746 F. Supp. 738 (M.D. Tenn. 1990) ...........................................2

*Goldstein v. NCAA*, No. 3:25-CV-27, 2025 WL 662809, (M.D. Ga.,
 Feb. 28, 2025) ....................................................................................................17

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.* (*Alston*), 375 F.
 Supp. 3d 1058 (N.D. Cal. 2019) ..........................................................................3

*M.B. v. Lee*, 2021 WL 6101486 at *1 (6th Cir. Dec. 20, 2021) ........................5, 16

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 97 (2021) ..................*passim*

*NCAA v. Board of Regents of Univ. of* Okla., 468 U.S. 85, 104 S.Ct.
 2948, 82 L.Ed.2d 70 (1984)..........................................................................2, 24

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F.3d 1049 (9th Cir.
 2015) ..............................................................................................................2, 17

*Ohio v. American Express Co.*, 585 U. S. 529, 543, n. 7 (2018)............................11

*Ohio v. National Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 594
    (N.D.W.V. 2023) ...........................................................................*passim*

*Osuna Sanchez v. NCAA*, No. 3:25-CV-62, 2025 WL 684271 (E.D.
    Tn., March 3, 2025) ................................................................................15

*Powers v. Baylines Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1996).....................10

*Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998) .............................................................2

*Smith v. Pro Football Inc.*, 593 F.2d 1173 (D.C. Cir. 1978)....................................13

*Tennessee v. NCAA,* 718 F.Supp.3d 756 (E.D. Tenn. 2024) .........................2, 11, 18

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) .............................................9

*Worldwide Basketball & Sports Tours, Inc. v. NCAA,* 388 F.3D 955,
    959 (6th Cir. 2004)............................................................................2, 19

## <u>STATEMENT OF THE CASE</u>

The NCAA's statement of the case correctly identifies the NCAA Bylaws at issue: Bylaws 12.8.1, 12.8.1.1, and 12.02.6 ("JUCO Transfer Restrictions"). The NCAA's statement of the case sets forth most of the procedural backdrop of the case but omits mention of the multi-hour preliminary injunction hearing conducted by the District Court on December 4, 2024. Memorandum Opinion Granting Preliminary Injunction ("Memorandum"), RE 41, Page ID # 1395. Prior to the hearing, the Parties also stipulated to use and admit all Declarations, including those from experts, into evidence, and the parties intended to call no witnesses to testify live at the hearing. *See* Stipulation as to Use of Declarations and Materials at the Preliminary Injunction Hearing, RE 36, Page ID# 1105.

The NCAA's statement of the case also mischaracterizes several aspects of Mr. Pavia's arguments and the District Court's ruling in an argumentative fashion. For instance, in his Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Mr. Pavia identified two relevant markets: (1) "the labor market for football players seeking to compete at the NCAA Division I Level";[1] and (2) "the nationwide market for consumption of college football."[2] Additionally, the District Court applied a "Rule of Reason" analysis to the case (*see* Memorandum,

---

[1] Memorandum in Support of Motoin for Temporary Restraining Order and Preliminary Injunction, RE 22, Page ID # 670.

[2] *Id.* at Page ID # 675.

RE 41, Page ID# 1407-1416), not a "quick look" as argued by the NCAA in its Statement of the Case. Rather than quibbling with such phraseology in this section, Pavia will address other relevant argumentative characterizations by the NCAA in the Argument component of this Brief.

## SUMMARY OF THE ARGUMENT

As it did before the District Court, The NCAA ignores *Alston*[3] (Granting Permanent Injunction) and *O'Bannon,*[4] asks this Court to apply a "presumption of procompetitiveness" that no longer exists,[5] and relies on decades old cases to argue that NCAA eligibility rules are entitled to exemption from the antitrust laws.[6] In fact, over the last five years, courts have routinely enjoined NCAA eligibility rules. *See, e.g., Tennessee v. NCAA,* 718 F.Supp.3d 756 (E.D. Tenn. 2024) (Granting Preliminary Injunction); *Ohio v. NCAA*, 706 F.Supp.3d 583 (N.D. W.Va., Dec. 13,

---

[3] *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

[4] *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F.3d 1049 (9th Cir. 2015).

[5] "The Court makes clear that the decades-old 'stray comments' about college sports and amateurism made in *NCAA v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), were dicta and have no bearing on whether the NCAA's current compensation rules are lawful. And the Court stresses that the NCAA is not otherwise entitled to an exemption from the antitrust laws." *Alston*, 141 S.Ct. at 2167, Kavanaugh, J. concurring.

[6] NCAA Brief, 6th Cir. RE 15 at Page ID# 33-37, *citing Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008); *Florida Worldwide Basketball & Sport Tours, Inc. v. NCAA,* 388 F.3D 955, 959 (6th Cir. 2004); *Smith v. NCAA*, 139 F.3d 180 (3d Cir. 1998); *Agnew v. NCAA*, 683 F. 3d 328, 342–43 (7th Cir. 2012); *Banks v. NCAA*, 746 F. Supp. at 861 (N.D. Ind. 1990); *Gaines v. NCAA*, 746 F. Supp. 738 (M.D. Tenn. 1990).

2023) (Granting Temporary Restraining Order); *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.* (*Alston*), 375 F. Supp. 3d 1058 (N.D. Cal. 2019) (Granting Permanent Injunction).

> As summarized by Pavia's expert, Professor Maxcy:
>
> "The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level as commensurate with the opportunity to earn exposure opportunities including NIL compensation while playing NCAA Division I football. The restraint further violates the Sherman Act athletes as penance for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA Division I institution. The eligibility bylaws induce potential football players to attend NCAA institutions when a JUCO school may be in their best interest, both academically and for development of their athletic potential."

Maxcy Decl., RE 33-1, Page ID # 902 at ¶ 30. The District Court correctly granted a preliminary injunction precluding the NCAA from prohibiting Pavia from playing football in 2025 by counting his 2021 season of junior college football under the Intercollegiate Competition Rule (NCAA Bylaw 12.02.6) and from punishing any university for which Pavia plays under its Rule of Restitution (NCAA Bylaw 12.11.4.2).

For purposes of this case, the JUCO Transfer Restrictions (including the Intercollegiate Competition Rule), as applied, preclude athletes who attend junior college before transferring to an NCAA Division I school from playing the same four years of Division 1 football available to non-JUCO transfers. In examining this issue, the District Court properly concluded—as a matter of fact—that the JUCO

Transfer Restrictions are commercial in nature because they impact the ability of college athletes to earn compensation for NIL because "virtually all football-related NIL funds go to Division I football players." Memorandum, RE 41, Page ID# 1397. Then the District Court properly concluded—as a matter of law—that the Sherman Act applies to the JUCO Transfer Restrictions.

After concluding that the Sherman Act applied, the District Court properly performed a Rule of Reason analysis and made many findings of fact concerning: (1) anti-competitive harm caused by the JUCO Transfer Restrictions; (2) the lack of any procompetitive justification for the JUCO Transfer Restrictions; and (3) the availability of less restrictive alternatives to accomplish any of the NCAA's alleged procompetitive justifications.

Give the factual findings of its Rule of Reason analysis, the District Court concluded Pavia had shown a substantial likelihood of success on the merits of his request for injunctive relief. The District Court then made additional factual findings that: (1) Pavia had proven irreparable harm; (2) the balance of equities favored Pavia; and (3) the public interest favored Pavia. As a result, the Court entered an appropriately limited preliminary injunction precluding enforcement of the JUCO Transfer Restrictions against Pavia.

The findings of fact were all supported by the record in the case and not clearly erroneous—especially given the procedural posture of a preliminary

injunction where a plaintiff need not prove his entire case. Based on the findings of fact, the District Court reached appropriate conclusions of law and did not abuse its discretion in entering the preliminary injunction. The Court should affirm the District Court's ruling.

## ARGUMENT

## I.    Standard of Review

"The district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. This standard of review is highly deferential to the district court's decision. Thus, we reverse a decision granting a preliminary injunction only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *DV Diamond Club of Flint, LLC v. Small Business Administration*, 960 F.3d 743, 746 (6th Cir. 2020) (internal citations omitted). This Court "review[s] the district court's legal conclusions de novo and its findings of fact for clear error." *M.B. v. Lee*, 2021 WL 6101486 at *1 (6th Cir. Dec. 20, 2021), citing *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam). Here the District Court used the appropriate standard, made no clearly erroneous findings of fact, and correctly applied the law. Accordingly, this Court should affirm the District Court's ruling.

## II.    The District Court Utilized The Appropriate Legal Standard

The NCAA does not meaningfully contest the District Court's utilization of the appropriate legal standard in considering preliminary injunctive relief. The District Court's Memorandum sets forth the appropriate standard with citation to Sixth Circuit authority, considering "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff is likely to suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the impact of the injunction on the public interest." Memorandum, RE 41, Page ID# 1402, citing *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). Then the District Court's Memorandum walked through each factor in a separately designated section.

Similarly, the District Court set forth the Rule of Reason analysis applicable in antitrust cases, citing *Alston*, 594 U.S. at 97, and went through each step of the burden shifting framework.

In short, the District Court utilized the appropriate legal standard in considering the request for preliminary injunctive relief.

## III.    The District Court Made No Clearly Erroneous Findings of Fact

The District Court made many findings of fact relevant to its decision, including:

- "[V]irtually all football-related NIL funds go to Division I football players." Memorandum, RE 41, Page ID# 1397.

- "Agreements between NIL collectives and student-athletes are commercial transactions." *Id.*, Page ID# 1405.

- "Rules restricting negotiation of those agreements are undoubtedly commercial transactions." *Id.*

- "Restrictions on who is eligible to play and therefore negotiate NIL agreements are also commercial in nature." *Id.*

- The JuCo Transfer Restrictions "induce potential football players to attend NCAA institutions rather than non-NCAA institutions even where non-NCAA institutions, such as junior colleges, might be in their best interest." Memorandum at Page ID# 1410.

- The JuCo Transfer Restrictions "give[] NCAA member schools an advantage in recruiting student athletes by restricting their NCAA eligibility if they enroll in a non-NCAA member school." *Id.* at Page ID# 1411.

- The JuCo Transfer Restrictions "cause downstream effects for consumers of collegiate athletics because the restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." *Id.* at Page ID# 1410.

- "[R]estricting the NCAA Division I eligibility of former junior college athletes to three or four years is [not] relevant to the 'differentiated athletic product' of Division I football." *Id.* at Page ID# 1413.

- The JuCo Transfer Restrictions are not "necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes." *Id.*

- The JuCo Transfer Restrictions are not necessary to "prevent more experienced athletes from 'crowding out' younger, less experienced athletes." *Id.* at Page ID# 1414.

- "[T]he NCAA's goal of maintaining a 'natural and standard degree progression' [] appears pretextual." *Id.*

- "Plaintiff's proposed alternative [of starting a player's eligibility clock when he enrolls and/or at an NCAA institution] eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA." *Id.* at Page ID# 1415.

- "[U]nder the circumstances here where there have been recent changes both to Pavia's personal circumstances and the legal landscape, the fact that Pavia did not challenge the eligibility rules until now does not discount the irreparable harm." *Id.* at Page ID# 1417.

- "Enjoining the NCAA from enforcing the Intercollegiate Competition Rule as to Pavia for next season will not result in substantial harm to others or to the NCAA." *Id.* at Page ID# 1418.

- "The Court finds Defendant faces no financial burden from the preliminary injunction." *Id.*

The District Court's findings are supported by the Declarations of Diego Pavia (RE 9-1, Page ID# 547 and RE 33-6, Page ID# 962), TJ Smith (an athlete at another NCAA institution) (RE 33-4, Page ID# 962), Jenna Beverly (Vanderbilt University staff member) (RE 33.5, Page ID# 964), Clark Lea (Vanderbilt University Head Football Coach) (RE 9-2, Page ID# 549), Paul Grindstaff (Director of the Anchor Collective) (RE 9-3, Page ID# 552), and Dr. Joel Maxcy (economist and expert witness) (33-1, Page ID# 888),[7] along with the documents cited within each of their Declarations. Such evidentiary support is more than sufficient because "'a

---

[7] The NCAA complains that Pavia attached an expert Declaration to a Reply Brief, but the Parties stipulated to the admission of the other Party's expert reports in connection with the evidentiary hearing on the Preliminary Injunction. *See* Stipulation, RE 36, Page ID# 1105. Accordingly, the NCAA has waived any complaint as to the admissibility of Prof Maxcy's expert testimony.

preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.' Accordingly, a party 'is not required to prove his case in full at a preliminary injunction hearing.'" *Certified Restoration Dry Cleaning Network, LLC. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

Further, the NCAA does not clearly challenge any of these factual findings as clearly erroneous. Instead, the NCAA argues evidentiary insufficiency with respect to certain factual matters: (1) injury to a definable market (Appellant's Brief, 6th Cir. RE 15, Page ID# 41-46); (2) rejection of the NCAA's supposed procompetitive justifications (*Id.* at Page ID# 48); and (3) approval of the less restrictive means set forth by Pavia (*Id.* at Page ID# 49).

Even if the District Court had conducted a full trial on the merits, the NCAA's factual arguments would fail, but the NCAA's argument that Pavia's "evidentiary showing was remarkably thin" is particularly unavailing when appealing a preliminary injunction because "the case has yet to be heard in full on the merits." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985) ("An appellate court in reviewing the propriety of a preliminary injunction should refrain from the unnecessary comment on the evidence or review of the merits of the case since the case has yet to be heard in full on the merits.").

Additionally. the main thrust of the NCAA's factual argument is argument that the District Court "appeared to reflexively adopt the unsupported assertions in [Pavia's expert witness's Declaration]."    Appellee's Brief, 6th Cir. RE Memorandum, RE 15 at Page ID# 43.  But the NCAA did not challenge Dr. Maxcy's qualifications or move to strike his testimony.  Rather, the Parties agreed to the admissibility of each opposing expert's Declaration.  *See* Stipulation, RE 36, Page ID# 1105.  As the trier of fact, the District Court had the right to accept or reject expert testimony. *Powers v. Baylines Marine Corp.*, 83 F.3d 789, 797 (6th Cir. 1996) (a trier of fact "is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion.").  Here, the District Court chose to credit Dr. Maxcy's testimony. The NCAA has not provided any basis requiring the District Court to disregard Dr. Maxcy's opinions at this stage in the proceedings.

With respect to the relevant market, Pavia identified two: (1) the labor market for Division I college football players; and (2) the consumer market for college athletics.  The NCAA did not dispute the use of such markets in the District Court's anti-trust analysis.  As the District Court noted,

> "Plaintiff asserts the relevant market is the labor market for college football athletes in general and NCAA Division I football specifically. (See Pl. Mem., Doc. No. 22 at 15). Although the NCAA argues Pavia has not offered evidence to support the proposed market definition, it does not dispute that the proposed market is the relevant market for purposes of the Court's antitrust analysis. (See Def. Resp., Doc. No. 30

10

at 22). Moreover, other courts considering antitrust challenges to NCAA eligibility rules have found that the labor market for college athletes, in this case college football, to be relevant labor markets. See e.g., *Alston*, 594 U.S. at 90 ('market for student athlete services'); *Tennessee,* 718 F.Supp.3d at 761-62 ('market for Division I athletics'); *Ohio*, 706 F. Supp. 3d at 592, Ex. A (finding that 'the labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets')."

Memorandum, RE 41, Page ID# 1408. Accordingly, because the NCAA previously conceded that the applicability of the college football labor market to this case, it cannot challenge that market identification on appeal. Regardless, as the District Court pointed out, "[t]he Supreme Court has stated that the definition of the market need not be precise when the challenged restrictions are a horizontal restraint on trade." *Id.* at Page ID# 1408, n. 8, *citing Ohio v. American Express Co.*, 585 U. S. 529, 543, n. 7 (2018).

With respect to damage to the college football labor market, Pavia's expert, Professor Maxcy, testified:

> "The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level as commensurate with the opportunity to earn exposure opportunities including NIL compensation while playing NCAA Division I football. The restraint further violates the Sherman Act by taking a year of NCAA Division I football and earning potential away from athletes as penance for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA Division I institution. The eligibility bylaws induce potential football players to attend NCAA institutions when a JUCO school may be in their best interest, both academically and for development of their athletic potential."

Maxcy Decl., RE 33-1, Page ID# 897 at ¶ 30.

The District Court accepted Dr. Maxcy's testimony and made a factual finding that the JuCo Transfer Restrictions "distort[ed] the labor market" because they "induce potential football players to attend NCAA institutions rather than non-NCAA institutions even where non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution." Memorandum, RE 41, Page ID# 1410.

The District Court also found that the JuCo Transfer Restrictions "give[] NCAA member schools an advantage in recruiting student athletes by restricting their NCAA eligibility if they enroll in a non-NCAA member school." *Id.* at Page ID # 1411. The NCAA incorrectly characterizes this finding as addressing "a separate market." Appellant's Brief, 6th Cir. RE 15, Page ID# 42. In fact, both Dr. Maxcy and the District Court note that the NCAA schools' advantage in recruiting causes "competitive harm in the market for NCAA Division I college football players." Memorandum, RE 41, Page ID# 1411.

Further, with respect to the NCAA's argument that Pavia only presented evidence of a negative impact on himself, the NCAA ignores Pavia's evidence that the JUCO Transfer Restrictions impact all former junior college football players – a group of athletes that historically make up two-thirds of the market for transfers to Division I Football Bowl Subdivision ("FBS") schools, with 10% of NCAA Division

I FBS new roster spots attributable to junior college transfers in 2019 according to the NCAA database.[8]   In seeming contradiction to its argument that the JUCO eligibility bylaws do not have a substantial impact on the market for Division 1 football players, the NCAA argues that the requested injunctive relief "potentially impact[s] thousands of student-athletes in the middle of the academic year." NCAA District Court Response Brief, RE 30, Page ID# 764.

The NCAA eligibility rule's ban on competition through a restraint of trade is very similar to the NFL draft rules struck down in 1978. *See Smith v. Pro Football Inc.*, 593 F.2d 1173 (D.C. Cir. 1978). The draft "amount[ed] to a 'total ban' on competition.… It permitted college players to negotiate *with only one team.* If a player could not contract with that team, *he could not play at all.*" *Id.* at 1187 (emphasis in original). Similarly, taking one to two years of eligibility away from former junior college players is a total ban on competition for their services.

The NCAA also argues that providing an extra year of eligibility to a junior college player has no impact on the overall market because the former junior college player would simply be replaced by a younger and less experienced player. But, as Professor Maxcy explains, this "is not a zero-sum proposition." Maxcy Decl., RE 33-1, Page ID# 902 at ¶47. Instead, the younger and less experienced players would

---

[8] https://www.ncaa.org/sports/2017/8/3/transfers-in-division-i.aspx?print=true (Last visited Nov. 26, 2024) as cited in Reply in Support of Motion for Preliminary Injunction, RE 33, Page ID# 878.

not be able to make as much money in NIL as the older players who have had a chance to make a name for themselves, increasing their future NIL opportunities. If he gets to play college football again next year, Pavia will likely make over a million dollars from NIL agreements. Maxcy Declaration RE 33-1, Page ID# 894 at ¶19. Conversely, if he is unable to play, Vanderbilt will have the ability to bring in one additional freshman at a much lower cost.[9]

Finally, the NCAA also ignores the District Court's factual finding of harm to the college athletics consumer market because the JUCO Transfer Restrictions "cause downstream effects for consumers of collegiate athletics because the restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level." Memorandum, RE 41, Page ID# 1410. Even in the absence of a factual finding of damage to the college football labor market, the damage to the downstream consumer market would be sufficient to maintain the preliminary injunction.

---

[9] Maxcy Decl., RE 33-1, Page ID# 902 at ¶47 ("[A]n outgoing star would be considerably more costly to the school than an incoming player. There is doubtless a financial advantage in moving older players out and replacing them with younger players. It is not a zero-sum proposition.")

In short, the District Court's factual findings concerning damage to a relevant market are not clearly erroneous. The District Court also made numerous findings of fact concerning its Rule of Reason analysis, which will be addressed *infra*.

## IV. The District Court Properly Applied the Law to Its Factual Findings

### A. The NCAA JUCO Restrictions Are Commercial In Nature

The NCAA focuses much of its brief arguing that no court has ruled that *all* NCAA eligibility rules are commercial in nature.[10] As an initial matter, Pavia neither challenges *all* NCAA eligibility rules, nor asserts that *all* NCAA eligibility rules are commercial in nature. Instead, with respect to this appeal, Pavia only challenges two rules limiting the ability of athletes who attend junior colleges to play NCAA Division I sports.

---

[10] For instance, the NCAA cited *Osuna Sanchez v. NCAA*, No. 3:25-CV-62, 2025 WL 684271 (E.D. Tn., March 3, 2025) for the proposition that *Alston* did not explicitly rule that *all* eligibility rules are commercial in nature. 6th Cir. RE 15, PageID # 25, 32, 37. Pavia does not argue any differently. Significantly, the *Osuna* court assumed, without deciding, that JUCO transfer rules *are* commercial in nature before beginning its antitrust analysis concerning collegiate baseball. *Id.* at *4. Baseball is a different sport than football with different physical development requirements and different rules concerning eligibility for the professional draft. As a result, the *Osuna* court ultimately concluded that there was "merit in aspects of both parties' arguments," such that it declined to enter a preliminary injunction based on the record before it. *Id.* at * 7. Ultimately, the *Osuna* court concluded, "None of this is to say Plaintiff cannot ultimately succeed on the merits. He may can." *Id.*

The District Court ruled: (1) the JUCO Transfer Restrictions are commercial in nature and, thus, (2) are subject to the Sherman Act.  Memorandum, RE 41, Page ID# 1403-06.  The NCAA appears to argue that this Court should review both rulings *de novo* as conclusions of law.  In fact, the Court made multiple findings of fact ((1) "Agreements between NIL collectives and student-athletes are commercial transactions"; (2) "Rules restricting negotiation of those agreements are undoubtedly commercial transactions"; (3) "restrictions on who is eligible to play and therefore to negotiate NIL agreements is (*sic*) also commercial in nature."),[11] followed by a conclusion of law based on those findings (the Sherman Act applies to the JUCO Transfer Restrictions).  The District Court's factual conclusions are subject to review for clear error and *de novo* review only applies to the District Court's legal conclusion that the Sherman Act applies to this case.  *See M.B. v. Lee*, 2021 WL 6101486 at *1 ("We review the district court's legal conclusions de novo and its findings of fact for clear error.").

Regardless, the NCAA incorrectly minimizes the impact of compensation for use of an athlete's name, image, and/or likeness ("NIL") in the wake of *Alston*, 594 U.S. 69.  As the Supreme Court pointed out in that case, "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis.  When it comes to college sports,

---

[11] Memorandum, RE 41, Page ID# 1405.

there can be little doubt that the market realities have changed significantly since 1984." *Alston*, 594 U.S at 93.

Contrary to the NCAA's argument, NCAA eligibility rules governing football (and men's basketball) players *are* commercial in nature during the present NIL era and any argument that all NCAA "eligibility rules [] do not regulate any commercial activity" is simply "not credible." *See O'Bannon v. Nat'l Collegiate Athletic Ass'n,* 802 F.3d 1049, 1064-65 (9th Cir. 2015). The *O'Bannon* court continued, "[t]he mere fact that a rule can be characterized as an 'eligibility rule,' however, does not mean the rule is not a restraint of trade; were the law otherwise, the NCAA could insulate its member schools' relationships with student-athletes from antitrust scrutiny by renaming every rule governing student-athletes an 'eligibility rule.' The antitrust laws are not to be avoided by such 'clever manipulation of words.'" *Id.* at 1065.[12]

---

[12] The NCAA cited *Goldstein v. NCAA*, No. 3:25-CV-27, 2025 WL 662809, (M.D. Ga., Feb. 28, 2025) for its holding that "O'Bannon is still good law" (NCAA Brief, 6th Cir. RE 15, PageID # 25) and its conclusion that JUCO Transfer Restrictions are "true eligibility rules" that are non-commercial in nature. Perhaps because its record was not further developed, the *Goldstein* Court appears unaware of the District Court's finding in this case that the JUCO Transfer Restrictions "give[] a competitive advantage to NCAA Division I member schools over junior colleges – and thus the football players at each level." RE 41, PageID #15. As a result, the JUCO Transfer Restrictions at issue here are "eligibility rules" that operate as a restraint of trade as identified in *O'Bannon*.

The District Court correctly addressed this issue and concluded that the JUCO

Transfer Restrictions were commercial in nature:

> "Plaintiff asserts that when the NCAA lifted the restriction on NIL compensation, rules regulating who can play – i.e., who can enter the labor market for NCAA Division I football – became "commercial in nature." The Court agrees. As the Tennessee court explained, "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." *Tennessee*, 718 F. Supp. 3d at 762. And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature. *See also*, *Ohio*, 706 F. Supp. 3d at 591 (restrictions on a student-athlete's ability to play are a restraint on trade and subject to the Sherman Act); *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (finding the NCAA's argument that rules prohibiting student-athletes from accepting prize money are non-commercial eligibility requirements that are not subject to the Sherman Act was "unlikely to be successful")."

Memorandum, RE 41, Page ID# 1405.

But even if the "market realities" had not changed, the District Court's

analysis remains correct under pre-*Alson* case law. For instance, in *Bassett*, this

Court held that an NCAA enforcement action against a coach was not "commercial

in nature" because it "did not give NCAA **a competitive advantage**." *Bassett*, 528

at 433 (emphasis added). In contrast, the District Court here made a factual finding

that the JUCO Transfer Restrictions give "**a competitive advantage** to NCAA

Division I member schools over junior colleges – and thus the football players at

each level – even though they are treated the same in terms of eligibility."

Memorandum, RE 41, Page ID# 1409 (emphasis added).  Accordingly, the JUCO

Transfer Restrictions are commercial in nature under the reasoning of *Bassett*

because they give the NCAA a competitive advantage.  *See also Worldwide*

*Basketball,* 388 F.3D at 959 (6th Cir. 2004). ("The dispositive inquiry in this regard

is whether the rule itself is commercial, not whether the entity promulgating the rule

is commercial.").

Whether characterized as a finding of fact or conclusion of law, the District

Court did not err in finding the JUCO Transfer Restrictions commercial in nature.

Of course, "this does not mean that the NCAA cannot impose eligibility rules, only

that those rules will be subject to further scrutiny to determine whether they are an

undue restraint on trade."  Memorandum, RE 41, Page ID# 1405, *citing Alston*, 594

U.S. at 95.

### B.    Pavia Has Shown Likelihood of Success on the Merits as Demonstrated by the District Court's Rule of Reason Analysis

In arguing against the District Court ruling, the NCAA incorrectly asserts that

the District Court utilized a "quick look" methodology rather than applying the Rule

of Reason.  NCAA Brief, RE 15, *passim*.  In fact, the District Court first set forth

Supreme Court precedent explaining the Rule of Reason analysis (Memorandum,

RE 41, Page ID# 1406), then spent the next eleven pages of its opinion walking

through the Rule of Reason framework and making factual findings: (1) that the

JUCO Transfer Restrictions have a substantial anti-competitive effect (*Id.* at Page

ID# 1407-11), (2) that the NCAA failed to present any persuasive procompetitive justifications (*Id.* at Page ID# 1411-15), and (3) that even if the NCAA had presented a valid procompetitive justification, Pavia had presented less restrictive alternatives to accomplish the same goals (*Id.* at Page ID# 1415-16).

### 1. The District Court Did Not Commit Clear Error in Ruling the JUCO Transfer Restrictions Have a Substantial Anticompetitive Effect on Both Relevant Markets

The District Court examined the substantial anticompetitive effect of the JUCO Transfer Restrictions, noting "[t]here is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have 'market power,'" citing both the United States Supreme Court and evidence from the present case. Memorandum, RE 41, Page ID #1408.[13] Then the District Court made several findings of fact concerning "evidence that the challenged eligibility rules harm competition." *Id.* at Page ID #1409.

First, the District Court found the JUCO Transfer Restriction "give[] a competitive advantage to NCAA Division I member schools over junior colleges – and *thus the football players at each level*…." *Id.* (emphasis added). In its Brief, the NCAA ignores the District Court's finding of fact that the competitive advantage

---

[13]  *Citing* (Maxcy Decl., Doc. No. 33-1 [RE 33-1, Page ID# 895] at ¶¶ 23-24; *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]")

afforded to NCAA Division 1 member schools impacts not just junior colleges, but also junior college football players seeking to join the labor market for NCAA Division 1 football.

The District Court went on to make a factual finding that the JUCO Transfer Restrictions "result[] in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically." *Id.* For both findings, the Court cited the expert testimony of Professor Maxcy. *Id.*, citing Maxcy Decl., RE 33-1, Page ID# 895-96 at ¶¶ 26-27.

The District Court made additional factual findings that "NCAA Division I member institutions compete directly with NJCAA schools for football talent." *Id*. at Page ID# 1409. As a result, the District Court made an additional finding of fact that JUCO Transfer Restrictions also impact the supply of the labor market for Division I football by "sway[ing]" athletes who have attended one year of junior college to transfer to a Division I school prematurely (i.e., before they have completed their associates degree) to avoid losing an additional year of eligibility. *Id*. "In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the

rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution." *Id.* at Page ID# 1410.

The NCAA makes no attempt to demonstrate that any of the above findings are clearly erroneous (because they are not).

The NCAA also entirely ignores the District Court's subsequent finding that the JUCO Transfer Restrictions "cause downstream effects for consumers of collegiate athletics … by limiting the years these players can compete at the Division I level," comparing the JUCO Transfer Restrictions to other NCAA transfer restrictions invalidated by *Ohio*, 706 F. Supp. 3d at 594. *Id.* Even if the District Court's findings of fact concerning the anti-competitive impact on the college football labor market were clearly erroneous (and they are not), the District Court's findings on the anti-competitive impact on the "downstream market for consumers of college athletics" would be sufficient to meet the first prong of the Rule of Reason test.

### 2. The District Court Did Not Commit Clear Error in Rejecting the NCAA's Supposed Procompetitive Justifications

After finding that the JUCO Transfer Restriction have an anticompetitive impact on both identified markets, the Court considered the NCAA's supposed procompetitive justifications. The NCAA complains that the District Court supposedly "gave incredibility short shrift to the procompetitive justifications offered by the NCAA." Appellant's Brief, 6th Cir. RE 15, Page ID# 48. In fact, the

District Court spent pages 17 through 21 of its Memorandum (RE 41, Page ID # 1411-15) analyzing each of the supposed procompetitive justifications offered by the NCAA (preserving intercollegiate athletics as a unique offering; and enhancing the experiences of student-athletes), before making factual findings rejecting each one:

- "[R]estricting the NCAA Division I eligibility of former junior college athletes to three or four years is [not] relevant to the 'differentiated athletic product' of Division I football." Memorandum, RE 41, Page ID# 1413.

- The JUCO Transfer Restrictions are not "necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes." *Id.*

- The JUCO Transfer Restrictions are not necessary to "prevent more experienced athletes from 'crowding out' younger, less experienced athletes." *Id.* at Page ID# 1414.

- "[T]he NCAA's goal of maintaining a 'natural and standard degree progression' [] appears pretextual." *Id.*

The NCAA does not even attempt to explain how any of the above findings are allegedly clearly erroneous.

### 3. The District Court Did Not Commit Clear Error In Recognizing Less Restrictive Means Identified by Pavia

Finally, even though it had not accepted any of the NCAA's supposed procompetitive justifications, the District Court still examined Pavia's proposed less restrictive means to achieve the NCAA's pro-competitive goals. Specifically, whereas the NCAA currently starts an athlete's "eligibility clock" when they register at any "collegiate institution," Pavia proposed replacing the word "collegiate" with

"NCAA."    Likewise, Pavia proposed amending the NCAA definition of "intercollegiate competition" to specify that such competition must take place at an "NCAA member institution" to count against the athlete's four years of eligibility. The District Court analyzed Pavia's proposal and made findings of fact:

> "Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA. For example, the proposed rules maintain restrictions on the duration of eligibility, thereby preserving the character of NCAA Division I sports as one played by student-athletes and ensuring that the student-athletes cannot remain in that status indefinitely. The proposal also maintains the linkage to the natural degree progression within the four-year institution and does not affect other eligibility rules such as amateurism and academic progression."

Memorandum, RE 41, Page ID# 1416.  Again, the NCAA complains of the ruling, but makes no attempt to explain how it is clearly erroneous.

Following its analysis, the District Court circled back to the start of its analysis, noting that the JUCO Transfer Restrictions may be "condemned in the 'twinkling of an eye'" because they are at one "end[] of the [antitrust] spectrum." *Id.* at Page ID# 1407 and 1416, citing *Alston*, 594 U.S. at 97 and *Board of Regents of Univ. of Okla.*, 468 U.S. at 110 n.39.  Contrary to the NCAA's argument, the District Court did not claim to have conducted a "quick look" analysis rather than applying the Rule of Reason.  The District Court had just spent a dozen pages setting forth its Rule of Reason analysis.

**C.    Pavia Demonstrated He Was Likely to Suffer Irreparable Harm**

The District Court also examined Pavia's claim of irreparable harm, ruling (as a finding of fact) that "the denial of the ability to play sports is irreparable harm." Memorandum, RE 41, Page ID# 1417, citing *Ohio*, 706 F. Supp. 3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (collecting cases).  In addition, the District Court found irreparable harm in "lost opportunity for exposure and building his 'personal brand.'"  *Id.*

The NCAA does not challenge such findings as clear error, but argues that Pavia alleged unreasonable delay in filing suit precludes any irreparable harm. NCAA Brief, 6th Cir. RE 15, Page ID# 50-52.  However, the District Court made a factual finding that Pavia did not unreasonably delay in filing suit due to "the constant evolution of the NCAA Bylaws since that decision and reports that the NCAA announced that it was considering providing five seasons of eligibility to athletes over the course of five years."  Memorandum, RE 41, Page ID# 1417.  As evidence, the Court cited its own footnote 11:

> See Compl., Doc. No. 1 at ¶ 43 (citing https://theyellowjacket.org/the-ncaa-begins-discussions-togive-all-student-athletes-the-chance-for-a-fifth-year-option/ (last visited Nov. 7, 2024)). After this issue was raised during the preliminary injunction hearing, the NCAA filed a Notice confirming that "the Division I membership has begun discussing potential changes to the four seasons of competition and five year rule." (NCAA Notice, Doc. No. 39 at 4).

The Court did not commit clear error in concluding that Pavia had established irreparable harm.

### D. The NCAA Does Not Contest the Balance of Equity or Impact on the Public Interest

Finally, in its Brief, the NCAA does not contest the District Court's assessment that "The balance of equities and the public interest also weigh in favor of granting the injunction."  Memorandum, RE 41, Page ID# 1418.  Accordingly, this issue has been waived.

## <u>CONCLUSION</u>

For the reasons set forth above, Diego Pavia respectfully requests that this Court affirm the preliminary injunction issued by the district court.

Dated: April 21, 2025

Respectfully submitted,

*s/Ryan Downton*
Ryan Downton
The Texas Trial Group
193 Dorado Beach East
Dorado, PR 00646
Telephone: (512) 680-7947
Email: Ryan@TheTexasTrialGroup.com

*s/Salvador M. Hernandez*
Salvador M. Hernandez
Riley & Jacobson, PLC
1906 West End Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com

*Counsel for Plaintiff/Appellee*
*Diego Pavia*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains approximately 6,467 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

Dated: April 21, 2025

<u>s/Salvador M. Hernandez</u>
Salvador M. Hernandez

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on April 22, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Salvador M. Hernandez*
Salvador M. Hernandez

## ADDENDUM: DESIGNATION OF RELEVANT RECORD DOCUMENTS:

| District Court Dkt. | Description | Page ID # |
|---|---|---|
| R.1 | Complaint for Injunctive Relief | 501–534 |
| R.1-1 | Exhibit 1<br><br>NIL at 3<br>The Annual Opendorse Report | 3–19 |
| R.1-2 | Exhibit 2<br><br>2024-25 NCAA Manual | 20–463 |
| R.1-3 | Exhibit 3<br><br>NCAA Guide for Two Year Transfers 2024-25 | 464–487 |
| R.1-4 | Exhibit 4<br><br>NCAA Division I COVID-19 Self-Applied Waiver Relief for Season of Competition and Extension of Eligibility | 488–491 |
| R.1-5 | Civil Cover Sheet | 492–493 |
| R.8 | Motion for Temporary Restraining Order and Preliminary Injunction | 541–544 |
| R.9 | Notice of Filing | 545–546 |
| R.9-1 | Declaration of Diego Pavia | 547–548 |

| R.9-2 | Declaration of Clark Lea | 549–550 |
|---|---|---|
| R.9-3 | Declaration of Paul Grindstaff | 551–552 |
| R.10-1 | Memo In Support of Motion for Temporary Restraining Order and Preliminary Injunction | 555–591 |
| R. 10-2 | Exhibit A to Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 592-608 |
| R.15 | Order Denying Motion for Ex Parte Temporary Restraining Order | 620–622 |
| R. 20 | Order of November 14, 2024 re Deadlines for Preliminary Injunction Hearing | 629-630 |
| R. 22 | Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 656-692 |
| R.30 | Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction | 731–767 |
| R.30-1 | Exhibit 1<br><br>Declaration of Jerry Vaughn In Support Of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction | 768–779 |

| R.30-2 | Exhibit 2<br><br>Declaration of Matthew Backus In Support Of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction | 781–819 |
|---|---|---|
| R.30-3 | Exhibit 3<br><br>Declaration of Taylor Askew In Support Of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction | 821–824 |
| R.30-4 | Exhibit 4<br><br>NJCAA<br>National Junior College Athletic Association | 825–826 |
| R.30-5 | Exhibit 5<br><br>History of the NJCAA | 827–828 |
| R.30-6 | Exhibit 6<br><br>OU Football's Dillon Gabriel Transfer to Oregon: Social Media Reacts | 829–831 |
| R.30-7 | Exhibit 7 | 832–836 |
| | Diego Pavia: Overlooked No Longer | |
| R.30-8 | Exhibit 8<br><br>NJCAA Name, Image & Likeness Bylaw | 837–838 |
| R.30-9 | Exhibit 9<br><br>NCAA Football Transfer Window 2023: Latest News, Updates, Takeaways | 839–850 |

| R.30-10 | Exhibit 10<br>Diego Pavia Timeline Events | 851–853 |
|---|---|---|
| R.30-11 | Exhibit 11<br>Week in 1,000 Words: Nevada Football's 'What If?' with New Vanderbilt Star QB Diego Pavia | 854–857 |
| R.30-12 | Exhibit 12<br>Diego Pavia Reveals He Joked With Clark Lea About Graduate Transfer: 'I don't need to go to class' | 858–860 |
| R.30-13 | Exhibit 13<br>NCAA Division I Transfer Windows | 861–862 |
| R.30-14 | Exhibit 14<br>NCAA Division I Committee on Student-Athlete Reinstatement Previously Approved Request List (Updated May 2024) | 863–871 |
| R.32 | Notice of Evidence In Support Of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction | 872–874 |
| R.33 | Reply In Support of Motion for Preliminary Injunction | 875–887 |
| R. 33-1 | Exhibit 1<br>Response of Joel G. Maxcy to Matthew Backus's Declaration In Support Of the Plaintiff's Motion, In Support Of Plaintiff's Motion for Preliminary Injunction | 888-905 |

| R.33-2 | Joel G. Maxcy CV | 906–935 |
|--------|------------------|---------|
| R.33-3 | Appendix 2 Document List | 936–937 |
| R.33-4 | Exhibit 2 TJ Smith Declaration | 938–940 |
| R.33-5 | Exhibit 3 The Athletic Article on CHL Players | 941–961 |
| R.33-6 | Exhibit 4 Diego Pavia Declaration | 962–963 |
| R.33-7 | Exhibit 5 Jenna Beverly Declaration | 964–966 |
| R.33-8 | Exhibit 6 Masterson Status Report | 967–971 |
| R.33-9 | Exhibit 7 ESPN CHL Lawsuit Article | 972–975 |
| R.34 | Declaration of Salvador M. Hernandez | 976–979 |
| R.34-1 | Exhibit A Journey Into JUCO: What to Know About Playing at the Junior College Level | 980–983 |
| R.34-2 | Exhibit B 2021-22 NJCAA Annual Report | 984–1007 |
| R.34-3 | Exhibit C Time, TV, Streaming Options for | 1008-1010 |

| | Saturday | |
|---|---|---|
| R.34-4 | Exhibit D<br>Chris Weinke - Wikipedia | 1011–1020 |
| R.34-5 | Exhibit E<br>Has the Transfer Portal Killed Junior College Recruiting? 'Someone Had Taken My Scholarship' | 1021–1028 |
| R.34-6 | Exhibit F<br>Michael Penix Jr., Jordan Travis, Sam Hartman Lead the Pack of 40-plus 6th Year Senior QBs | 1029–1040 |
| R.34-7 | Exhibit G<br>Dillon Gabriel - Wikipedia | 1041–1045 |
| R.34-8 | Exhibit H<br>Bo Nix - Wikipedia | 1046–1051 |
| R.34-9 | Exhibit I<br>40/60/80 Rule: Do Baseball Community College Transfers Have a Fair Shot? | 1052–1100 |
| R.34-10 | Exhibit J<br>NCAA Division I Transfer Windows | 1101 |
| R.35 | Notice of Evidence In Support of Plaintiff Diego Pavia's Motion for Preliminary Injunction | 1102–1104 |
| R. 36 | Stipulation as to Use of Declarations and Materials at the Preliminary | 1105-1106 |

| | Injunction Hearing | |
|---|---|---|
| R. 37 | Exhibit List - admitted<br>*See* Appellee Pavia's Appendix for admitted Exhibit | 1107 |
| R.38 | Preliminary Injunction Hearing Transcript | 1108–1227 |
| R.39 | Defendant's Filing Relating to Plaintiff's Motion for Preliminary Injunction | 1228–1233 |
| R.39-1 | Exhibit 1<br><br>Declaration of Taylor Askew In<br><br>Support of Defendant's Filing Relating to Plaintiff's Motion for Preliminary Injunction | 1234–1237 |
| R.39-2 | Exhibit 2<br><br>NCAA DI Council Votes to<br><br>Make CHL Players Eligible | 1238–1243 |
| R.39-3 | Exhibit 3<br><br>[Revised Proposed] Order Granting Plaintiff's Motion for Preliminary Settlement Approval as Modified | 1244–1254 |
| R.39-4 | Exhibit 4<br><br>Amended Stipulation and Settlement Agreement | 1255–1390 |
| R.39-5 | Exhibit 5<br><br>Judge Gives Preliminary Approval for NCAA Settlement Allowing Revenue-Sharing with Athletes | 1391–1393 |

| R.40 | Order regarding Statements or Exhibits Concerning Matters on Topics Other Than That Specifically Requested. | 1394 |
|------|------|------|
| R.41 | Memorandum regarding Motion for Preliminary Injunction | 1395–1419 |
| R.42 | Order Granting Plaintiff's Motion for Preliminary Injunction | 1420 |
| R.43 | National Collegiate Athletic Association's Notice of Appeal | 1421–1423 |
| R.44 | United States Court of Appeals Notice of Appeal | 1424–1426 |